UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

Plaintiff,

v.

The City of Saint Paul,

Defendant.

Civil File No. 00-258 MJD/JGL
(MJD)

MEMORANDUM OPINON
AND ORDER

---

Gregory G. Brooker, Assistant U.S. Attorney on behalf of HUD.
Meghan L. Riley, Assistant City Attorney on behalf of The City.

---

## BACKGROUND

On April 22, 1999, the Department of Housing and Urban Development (hereinafter "HUD") acquired a home located at 1328 Minnehaha Avenue in Saint Paul. This single family home was acquired under the "Single Family Mortgage Insurance Program, " a program created by Congress in the National Housing Act, 12 U.S.C. §§ 1701-1750g. Under this program, homes are to be immediately marketed at affordable prices. 56 Fed. Reg. 13,996 (1991). HUD regulations also provide that homes will not be renovated, rather they "will be offered for sale in 'as-is' condition..." 24 C.F.R. § 291.100(c)(1), (2) & (3) (1999). HUD and First Preston Management, Inc. (hereinafter "First Preston"), the contractor hired by HUD to manage and market HUD homes, began marketing the house after it was acquired.

FILED MAY 01 2000
FRANCIS E. DOSAL, CLERK MAY 01 2000
JUDGMENT ENTD________
DEPUTY CLERK________

On August 6, 1999, the City of Saint Paul (hereinafter the "City") issued to the Secretary of HUD an "Order to Abate Nuisance Property." Sullivan Aff., Ex. B. This Order stated that a City inspector had determined that the home at 1328 Minnehaha Avenue was a "nuisance building" pursuant to Chapter 45 of the St. Paul Legislative Code[1] (hereinafter the "Code"). The Order further provided if HUD did not correct the nuisance conditions within fifteen days, the City was authorized to begin the process to demolish and raze the home. At the same time the Order was issued, the City inspector posted a placard on the home declaring that the home is a "nuisance condition." Id.

On August 26, 1999, a code compliance inspection was conducted on the Minnehaha home. The repairs required by the City inspector were not limited to correcting immediate health and safety problems but included many modernization and renovation repairs, such as replacing floor coverings, repairing the garage, new storms and screens for all doors and windows and painting the interior and exterior of the home. The estimated cost of making the required repairs was about $30,000 to $40,000.

Because HUD did not respond to the Code compliance inspection by either posting a bond, acquiring building permits or by beginning the repairs, and because this case involved the possible demolition of the home, the City initiated its Substantial Abatement procedures set forth in Chapter 45.11 of the Code.

---

[1] Pursuant to the City ordinances, a "nuisance building" is defined as a vacant building or portion of a vacant building that has multiple housing or building code violations which has conditions constituting material endangerment or which has a documented and confirmed history of blight on the community. St. Paul Code, § 45.02.

Pursuant to the Code, if remedial action is not taken within the time prescribed, the matter is referred to the City Council, who, after a public hearing, may order the City to abate the nuisance and to charge all costs to the owner. Code, § 45.11(1)(f). An abatement hearing is then scheduled before the City council. Id. § 45.11(3). Notice is then sent to the owner. Id. § 45.11(4). Prior to the hearing, a legislative hearing officer shall provide the owner with an opportunity to meet and informally discuss the matter. Id. § 45.11(4a). The legislative hearing officer may then make a recommendation to the City Council. Id. In this case, a meeting before the legislative hearing officer was scheduled for October 19, 1999. HUD failed to appear at this hearing. Because HUD failed to appear, the legislative hearing officer recommended that the City Council pass a resolution, ordering HUD to repair or remove the building within fifteen (15) days.

On October 27, 1999, HUD received an offer of $25,009 to purchase the home from Mr. Keith P.Burg. Mr. Burg is aware of the Code compliance issues and is able and willing to make all of the repairs required by the City. Burg Aff. ¶¶ 4-7. Also on October 27, 1999, the City Council held a hearing to consider demolishing the Minnehaha home. Prior to the hearing, Mr. Burg talked with City officials regarding his offer to purchase the Minnehaha home and his ability to fund the necessary repairs. Burg Aff. ¶ 12. At the hearing, First Preston informed the City Council of Mr. Burg's offer. However, the City Council nonetheless passed a resolution ordering HUD to repair or remove the building within 15 days, based upon one Council member's concern that the prospective owner was incapable of rehabilitating the home. Sullivan Aff., Ex. H. Both HUD

and Mr. Burg have unsuccessfully attempted to request that the Order to demolish the home be reconsidered. As no repairs were made as of November 15, 1999, the City initiated demolition procedures. Riley Aff., Ex. A ¶ 25.

On February 3, 2000, the United States, on behalf of HUD filed a Complaint seeking Declaratory Judgment against the City. HUD asserts that the Supremacy Clause of the United States Constitution and preemption principles prevent the City from demolishing the property located at 1328 Minnehaha Avenue in Saint Paul. The United States seeks a permanent injunction enjoining the City from ordering the Secretary of HUD to make extended renovations to HUD-owned homes under the City's nuisance abatement ordinance and from demolishing homes owned by HUD where the ordered renovations have not been made.

The Minnehaha home was scheduled for demolition on or around February 14, 2000, pursuant to the City's Nuisance Abatement Ordinance. On February 14, 2000, HUD obtained a Temporary Restraining Order (TRO), restraining the City from demolishing the property until the disposition of the declaratory action could be determined. This matter is before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

## DISCUSSION

### A. HUD's Immunity from Local Regulations under the Supremacy Clause

HUD alleges that the Intergovernmental Immunity Doctrine, founded in the Supremacy Clause, immunizes HUD from the City's actions in this case, relying

on the seminal opinion in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819). "The primary purpose which the supremacy of the Federal Government serves is the carrying out, free from individual state control or interference, the measures of government created . . . for the benefit of [all]." Id. at 435. The focus in Intergovernmental Immunity cases is not on the validity of the state or local law, but rather on the effect such laws have on the operations of the federal government. Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 188 (1988)(J. White dissenting). In other words, the inquiry is whether the state or local law would "retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." M'Culloch, at 435.

HUD argues that the City's Codes do interfere and burden the goal of the National Housing Act to ensure a "decent home and a suitable living environment for every American family." 12 U.S.C. § 1701t. To assist in achieving this goal, Congress established HUD to insure mortgages on single-family homes. 12 U.S.C. § 1709. Congress also granted HUD broad authority to dispose of homes it acquires under the Single Family Mortgage Program.

> Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Secretary shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him in exchange for debentures and certificates of claims as provided in this section. . The Secretary shall, by regulation, carry out a program of sales of such properties and shall develop and implement appropriate credit terms and standards to be used in carrying out the program . . . The Secretary may sell real and personal property acquired by the Secretary pursuant to the provision of this chapter on such terms and conditions as the Secretary may prescribe.

12 U.S.C. § 1710g.

The regulations promulgated pursuant to the National Housing Act require only that hazardous conditions must be immediately repaired. HUD Ex. A., Sullivan Aff. ¶ 15. As noted earlier, homes are then sold on an "as-is" basis. 24 C.F.R. § 291.100(c). HUD asserts that previously, its regulations required that more extensive renovations prior to sale were to be made. HUD Ex. E, McCloskey Aff. ¶ 3. But for a number of reasons[2], HUD eventually changed its regulations in the mid-1970's, providing that the homes be sold "as-is" in order to "dispose of properties in a manner that expands homeownership opportunities, strengthens neighborhoods and communities, and ensures maximum return to the mortgage insurance funds." Id. ¶ 4; 24 C.F.R. § 291.1(2).

HUD argues that as illustrated by the facts of this case, the City's Code, which would require HUD to expend funds on repairs, interferes and impedes HUD's rules and regarding the disposition of its properties and the goals of Congress.

In the case of Commonwealth of Massachusetts v. Hills, 437 F.Supp. 351 (D. Mass. 1977), the court addressed a similar issue as that involved here. In that case, the Secretary of HUD was charged with violating a state sanitary code in a home acquired by HUD under the Single Family Mortgage Insurance Program. The court held that as Congress vested the authority to act in the Secretary, "the

[2] HUD determined that extensive renovations and cosmetic repairs were not cost-effective because purchasers do not assign as much value to such repairs. In addition, such repairs were not cost-effective as many repairs were damaged by vandalism. HUD also experienced problems with

Secretary was not subject to regulation by the state legislature by means of the State Sanitary Code. Consequently, she is not subject to criminal prosecution for violation of the Sanitary Code . . . To allow subjection to such prosecution would interfere with the HUD Secretary's official duties in maintaining property acquired by HUD as authorized by . . . the National Housing Act. . . " Hills, 437 F.Supp. at 353.

The City asserts that the proper Supremacy Clause analysis requires this Court to determine whether state law is incompatible with the action of the federal government and does not provide immunity to HUD. It argues that unlike federally owned property such as a courthouse, HUD homes are not used for the purposes of execution of federally enumerated powers. Therefore, HUD is not entitled to immunity from its Code. In support, the City cites to Burroughs v. Hills, 741 F.2d 1525, 1528 (7th Cir. 1984).

Burroughs, however, is not applicable here because it was decided when HUD regulations required property management to conform to local regulation. Id., at 1528. As has been shown by HUD, the regulations no longer require that repairs be made to homes prior to sale, nor do the regulations explicitly provide that HUD must comply with local housing codes. Although there is no case on point, HUD argues that the principles set forth in M'Culloch and its progeny nonetheless support the application of Intergovernmental Immunity in this case. The Court agrees.

---

subcontractors, and had difficulty monitoring contractors to ensure the proper work was done, and to avoid fraud. McCloskey Aff. ¶¶ 6-12.

In M'Culloch, the Supreme Court addressed the issue of whether the State of Maryland could constitutionally impose operational taxes upon a federal bank located in Baltimore. The Court first recognized that establishing a bank was not among the enumerated powers granted by the Constitution, but nonetheless held that the government was constitutionally empowered to create a bank. The Court further recognized that the state has the power to tax, but that such power may not extend to the federal government pursuant to the Supremacy Clause.

> If the states may tax one instrument, employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent-rights; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government, to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make the government dependent on the states.

Id. at 432. The Supreme Court thus held that

> [t]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

Id, at 436.

In this case, Congress has created a federal program to ensure decent homes for American families. Pursuant to this goal, HUD has found a buyer who is willing to purchase and repair the Minnehaha home in accordance with the City's Codes. Demolition of the Minnehaha home pursuant to the Codes is a clear example that the Codes do interfere and burden HUD's goals.

The City also argues that in delegating authority to the Secretary of HUD, Congress acknowledged the ability of state and local governments to regulate federally owned properties.

> Except as such authority is otherwise expressly provided in any Act administered by the Secretary, the Secretary is authorized to
>
> (a) . . . purchase at any foreclosure or any other sale any property in connection with which he has made a loan or grant. In the event of any such acquisition, the Secretary may, notwithstanding any other provision of law relating to the acquisition, handling, or disposal or real property by the United States, complete administer, remodel, and convert, dispose of, lease and otherwise deal with, such property: Provided, That any such acquisition of real property shall not deprive any State or political subdivisions thereof of its civil or criminal jurisdiction in and over such property.

42 U.S.C. § 3535(i) (1998)(emphasis added). The City claims that this statute clearly evidences Congress' expressed intent that HUD-acquired properties are subject to state and local regulations. The City misinterprets the emphasized language of Section 3535(i), however. Rather than evince Congressional intent that HUD-owned homes are subject to local code ordinances, such language is intended to make clear that HUD-owned homes are not federal enclaves, therefore residents of such homes are allowed to vote, and local police may make arrests. See, United States v. Chester, 144 F.2d 415 (3rd Cir. 1944); Oklahoma City v. Sanders, 94 F.2d 323 (10th Cir. 1938).

The City further asserts that state and local housing regulations can coexist with federal law, and that in this case, the City's Codes do not conflict with federal law. For example, it argues that if HUD responds to the Order to Abate Nuisance with evidence of a purchaser who is ready and able to make the

necessary repairs, an extension of time may be granted to allow the owner to close on the property. The City further asserts that if evidence of a pending sale is brought to the hearing before the legislative hearing officer, HUD is granted more time to close the sale. The City claims that HUD did not take any action in response to the City's Order to Abate Nuisance, and that this lack of response combined with no change in the property caused the City to initiate procedures to abate on its own. The City contends that any conflict HUD perceives is a result of HUD's inaction in responding to the Order.

The City further argues that if HUD makes the repairs, the price of the repairs will be reflected in the purchase price of the property. The City asserts that if HUD doesn't make the repairs and sells the home at a much lower price, the homeowner will eventually have to make the necessary repairs. The City claims that a delay in making repairs to a dilapidated condition will cause the condition to further deteriorate, thereby increasing the cost of repairs for the homeowner.

The Court finds that the position of the City is misplaced. In addressing the issue of Intergovernmental Immunity, the issue is whether the City's Codes interfere or burden HUD's duties to dispose of homes in a manner to further the goals of Congress. Given the broad authority delegated to HUD by Congress, HUD acted within its powers to determine that the homes it acquired should be sold an on as-is basis. The City's Codes would interfere with this determination by requiring HUD to make repairs the City deems necessary, rather than HUD. The Codes further interfere and burden HUD by requiring them to find buyers within time frames set by the Codes, or by forcing HUD to post performance bonds.

The Court thus agrees that HUD, in disposing of properties pursuant to federal law and regulations, must be immune from state or local law when such law interferes or burdens HUD. In so deciding, this Court is mindful of the fact that HUD acquires tens of thousands of homes across the country every year. For HUD to carry out its congressionally mandated duties, it must be free to operate its programs in any manner the Secretary deems appropriate without the concern that its regulations may conflict or are not compatible with a particular cities' housing codes.

B. Federal Preemption

In addition to the fact that HUD is immune from local housing codes, HUD is entitled to judgment in this case because the City's Codes actually conflict with applicable federal law and regulations. "When the Federal Government acts within the authority it possesses under the Constitution, it is empowered to pre-empt state laws to the extent it is believed that such action is necessary to achieve its purposes." City of New York v. Federal Communications Commission, 486 U.S. 57, 63 (1988). The Supreme Court has recognized a number of ways in which Congress may be understood to have preempted state law, and has also recognized that "a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law." Id. at 63-64.

The City's effort to enforce the Code in this case stands as an obstacle to the accomplishment and execution of the purposes and objectives of the federal

housing programs. Specifically, the Code's abatement ordinance and demolition orders directly conflict with HUD's authority under the National Housing Act, 12 U.S.C. § 1701-1750g, the Housing and Urban Development Act of 1968, Pub. L. No. 90-448, 82 Stat. 504 (1968) and HUD's property disposition regulations, 24 C.F.R. Part 291 (1999). Under the National Housing Act, Congress specifically delegated to the Secretary of HUD the authority to exercise his discretion in determining what repairs, if any, HUD should make. This authority was subsequently broadened. Pub. L. No. 105-276, Title VI, § 601 (d), 112 Stat. 2670 (1998)(Codified at 12 U.S.C. § 1710g)). Courts have recognized this broad authority afforded the Secretary. See, Booker v. Edwards, 99 F.3d 1165 (D.C. Cir. 1996).

The Code also conflicts with the Housing and Urban Development Act of 1968, by allowing for the destruction of HUD-owned homes during the period that HUD is marketing such property. Finally, it conflicts with HUD's regulations, the main purpose of which is to reduce inventory in a manner to ensure the maximum return to the mortgage insurance fund.

The City argues that compliance with its Codes creates no conflicts with federal laws or regulations because the purposes of the applicable Codes to ensure that a nuisance condition is abated so that the future homeowner can reside in a safe and healthy living environment. The City asserts that this does not frustrate the goal of the National Housing Act but also works in furtherance of it to provide a "suitable and decent living environment for every American family."

The City further argues that the HUD Handbook 43.10.5 REV-2 (1994) (Hereinafter "Handbook"), Chapter 10, Section III identifies a procedure for disposal of HUD-acquired properties. The City claims that the Handbook creates an exception to the general rule by acknowledging that local codes may require that repairs be made instead of selling the property in as-is condition. The City contends that the Handbook should be considered part of HUD's regulatory scheme. See e.g., Immigration and Naturalization Service v. National Ctr. For Immigrants' Rights, Inc., 502 U.S. 183 (1991).

The HUD Handbook is for internal use only and is not an agency rule or regulation. See United States v. Hauck, 980 F.2d 611, 614 (10th Cir. 1992). In addition, the provision cited by the City provides that HUD "field offices may undertake limited repairs prior to selling certain properties." (Handbook, City Exh. F, p.6-7)(emphasis added). It further provides that "the as-is sales approach is the preferred disposition technique." Id. Rather than support the City's position in this case, the HUD Handbook is actually consistent with its regulations and recognizes that the Secretary of HUD, not the City, has the discretion to decide which homes should be sold as-is, which should be repaired, and which should be razed. The City's Code directly conflicts with the demolition provision in the Handbook and the regulations by attempting to take the power from the Secretary and give it to the City.

Similarly, the Code policy to postpone the decision to demolish for six months if HUD brings forth evidence of a pending sale also presents a conflict. If HUD were to comply with this policy it would have to find a purchaser before

the hearing officer stage of the ordinance's procedures or risk the City Council ordering a demolition. This requirement of a mandatory local deadline on HUD's process interferes with Congress' broad grant of authority and discretion to the HUD Secretary.

C. Injunctive Relief

Because the Court finds that HUD is immune from the Code's nuisance abatement procedures, and that such local regulation is preempted by federal law and regulations, HUD need only show irreparable harm to entitle it to injunctive relief. Bank One v. Guttau, 190 F.3d 844, 847-848 (8th Cir. 1999) cert. denied, __ S.Ct. __, 2000 WL 177432 (U.S. Apr. 24, 2000).

HUD argues that it is entitled to injunctive relief, as its programs will be irreparably harmed if a permanent injunction is not ordered. HUD asserts that if the home at 1328 Minnehaha is demolished, other HUD homes in the future will be too. This demolition of affordable housing frustrates the goal of the National Housing Act. The Court agrees that HUD will be irreparably harmed if the City is allowed to demolish HUD-owned homes pursuant to its Code. Accordingly, HUD is entitled to injunctive relief.

IT IS HEREBY ORDERED that HUD's Motion for Summary Judgment is GRANTED in its entirety.

IT IS FURTHER ORDERED that the Secretary of the U.S. Housing & Urban Development ("HUD") or any agent, officer, or employee of HUD is immune from the application of Defendant City of St. Paul's Nuisance Abatement Ordinance, Chapter 45 of the St. Paul Legislative Code, ("Chapter 45") to HUD-

acquired homes located in St. Paul and that federal law preempts and makes invalid Chapter 45 as it has been or may be applied to HUD;

IT IS FURTHER ORDERED that Defendant City of St. Paul is permanently enjoined from 1) ordering the Secretary of HUD or any other agent, officer, or employee of HUD in the future to abate any nuisance conditions that the City has identified in any property owned by HUD; 2) demolishing as a nuisance building any structure located on a property owned by the Secretary of HUD; or 3) taking any other action inconsistent with this Order, including any mandatory inspections that would hinder the use or transfer of HUD-owned properties.

IT IS FURTHER ORDERED that the City of Saint Paul's Motion for Summary Judgment is DENIED.

Date: 5-1-00

Michael J. Davis
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.